**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIGNAL PEAK ENERGY, LLC, a Limited Liability Company, | ) ) ) |
| Plaintiff, | ) ) Case No. _1:24-CV-366_____ |
| v. | ) ) ) |
| DEB HAALAND, Secretary of the Interior, The DEPARTMENT OF THE INTERIOR, LAURA DANIEL-DAVIS, Acting Deputy Secretary, SHARON BUCCINO, Principal Deputy Director of Office of Surface Mining and Reclamation, and the OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Signal Peak Energy, LLC ("Signal Peak"), through its counsel, brings this action for declaratory and injunctive relief against the Secretary of the Interior (the "Secretary"), the Department of the Interior (the "Department"), the Acting Deputy Secretary of the Interior, the Principal Deputy Director of the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), and OSMRE (collectively, "Federal Defendants"):

# **INTRODUCTION**

1.      Signal Peak submits this Complaint in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12.

2.     This action is prompted by the Federal Defendants' failure to act in accordance with NEPA's statutory and regulatory deadlines to complete preparation of an environmental impact statement ("EIS").

3.     The Federal Defendants stated in federal court on December 2, 2022 that an EIS would be required to complete OSMRE's review of the mining plan for the federal coal in the third amendment to Signal Peak's mining permit ("AM3").

4.     OSMRE issued a Notice of Intent to prepare an EIS for its review of AM3 on August 7, 2023.

5.     Recent amendments to NEPA require an agency to complete its review within two years of determining that an EIS is required or the publication of a Notice of Intent to prepare an EIS, whichever is sooner.  Existing NEPA regulations require completion of an EIS within two years of the Notice of Intent.

6.     On February 6, 2024, OSMRE issued a schedule that projects the agency will complete the EIS and issue a Record of Decision at the end of May 2026, three and a half years after it determined an EIS is required.  The Department's final decision is not expected until July 2026.

7.     OSMRE's schedule illegally arrogates for itself, without consultation with the applicant, eighteen months more than Congress permits to complete a NEPA review.

8.     Even if the December 2024 deadline did not apply, OSMRE's new schedule indicates it will miss the August 7, 2025 deadline, measured from the August 2023 notice of intent, by almost a year.

9.      Indeed, OSMRE's current schedule on its own, disregarding the agency's 14-month "progress" to date, violates NEPA by proposing two years and four months to complete the remaining work.

10.      Where, as here, an agency is not acting "in accordance" with NEPA's deadlines, the law authorizes an applicant to petition the Court for an order to establish "a schedule and deadline for the agency to act." 42 U.S.C. § 4336a(g)(3).

11.      Because OSMRE has not made meaningful progress on the EIS to evaluate AM3 in the fourteen months since it determined an EIS is necessary and projects that it will not complete the EIS by the applicable statutory deadline, Signal Peak is entitled to an order from this Court to establish a schedule and a deadline for the agency to act in compliance with the statutory deadline.

## JURISDICTION AND VENUE

12.      This action arises under NEPA, 42 U.S.C. §§ 4321–4370m-12, and the APA, 5 U.S.C. §§ 701–706.  This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of the United States); 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed plaintiff); and 5 U.S.C. §§ 701–706 (APA).

13.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 1361, 2201–2202 and 5 U.S.C. §§ 705–706.

14.      Venue is proper under 28 U.S.C. § 1391(e)(1) as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, and at least one of the defendants

is a resident of the District of Columbia and a substantial part of the events giving rise to the claims occurred in the District of Columbia.

15.     The challenged actions are subject to judicial review under 5 U.S.C. §§ 702, 704, 706.

## **PARTIES**

16.     Plaintiff SIGNAL PEAK ENERGY, LLC , is a limited liability company located in Roundup, Montana.  Signal Peak owns and operates the Bull Mountains No. 1 Mine ("Mine"), an underground coal mine located in Musselshell and Yellowstone Counties, Montana.

17.     Defendant DEBRA HAALAND, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior and, in that capacity, is ultimately responsible for implementing and complying with federal laws governing mining plan modifications, including NEPA.  She is sued in her official capacity.

18.     Defendant U.S. DEPARTMENT OF THE INTERIOR, is the department within the executive branch with supervisory control over the OSMRE and that is responsible for implementing and complying with federal laws governing mining plan modifications, including NEPA.

19.     Defendant LAURA DANIEL-DAVIS, acting Deputy Secretary of the Interior, was previously Principal Deputy Assistant Secretary for Land and Minerals Management, a position that is now vacant.  Ms. Daniel-Davis's responsibilities are assumed to include the traditional delegated authority from the Secretary to the Assistant Secretary for Land and Minerals Management for the approval, conditional approval, or disapproval of applications for mining plan modifications.  She is sued in her official capacity.

20.     Defendant SHARON BUCCINO, Principal Deputy Director of the OSMRE, is ultimately responsible for assuring lawful environmental review of mining plan modifications under NEPA and recommending approval, conditional approval, or disapproval of applications for mining plan modifications.  No person currently serves as Director of the OSMRE.  She is sued in her official capacity.

21.     Defendant U.S. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT ("OSMRE") is a federal agency within the U.S. Department of the Interior that is responsible for assuring lawful environmental review of mining plan modifications under NEPA and recommending approval, conditional approval, or disapproval of applications for mining plan modifications.

## FACTUAL ALLEGATIONS

### I.     National Environmental Policy Act

22.     "NEPA is the country's basic national charter for the protection of the environment." *S. Utah Wilderness All. v. Bernhardt*, 512 F. Supp. 3d 13, 16 (D.D.C. 2021). NEPA is intended to ensure that agency decision makers are informed of the environmental effects of proposed federal actions and that relevant information is made available to the public so that it "may also play a role in both the decisionmaking process and the implementation of that decision."  *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

23.     To assist in meeting these goals, NEPA requires preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); 40 C.F.R. § 1502.3.

24.     NEPA also requires that every agency must "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(H).  NEPA

regulations historically acknowledged that the alternatives evaluation is "'the heart of' the EIS." *Stand Up for Cal! v. United States Dep't of the Interior*, 410 F. Supp. 3d 39, 58 (D.D.C. 2019) (quoting 40 C.F.R. § 1502.14.  Regulatory changes removed "colloquial language" but did not relieve agencies of the obligation to provide a comparative analysis of the environmental effects of alternatives that "provide[s] information sufficient to permit a reasoned choice of alternatives."  85 Fed. Reg. 43304, 43330 (July 16, 2020).

25.     NEPA regulations require the agency to analyze a reasonable range of alternatives, but do not specify the number of alternatives that need to be considered.  *Id*. § 1502.14.

26.     Ultimately, "NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action." *Id.* § 1500.1(a).  "The purpose and function of NEPA are satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process."  *Id.*

27.     The Council on Environmental Quality ("CEQ"), charged with overseeing NEPA implementation, has promulgated NEPA regulations that apply to all federal agencies.  The regulations set time limits for NEPA compliance "[t]o ensure that agencies conduct NEPA reviews as efficiently and expeditiously as practicable."  40 C.F.R. § 1501.10(a).  Agencies "shall complete" EISs within two years "unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit."  *Id.* § 1501.10(b)(2).  "Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed."  *Id.*

28.     On June 3, 2023, to further reinforce the federal commitment to efficient and expeditious NEPA review, Congress enacted amendments to NEPA as part of the Fiscal Responsibility Act.  Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10. Congress added a two-year statutory deadline for an EIS.  *Id*. at sec. 321, § 107(g)(1)(A),  137 Stat. 10, 42  (codified at 42 U.S.C. § 4336a(g)).  NEPA now provides that "a lead agency shall complete . . . the [EIS] not later than the date that is 2 years after the sooner of, as applicable . . . the date on which such agency determines that [NEPA] requires the issuance of an [EIS] with respect to such action . . . [and] the date on which such agency issues a notice of intent to prepare the [EIS] for such action."  42 U.S.C. § 4336a(g)(1)(A).  If an agency determines it cannot meet the two-year deadline, it may be extended, "in consultation with the applicant," but only for "so much additional time as is necessary to complete such [EIS.]"  *Id.* § 4336a(g)(2).

29.     If an agency fails to "act in accordance with an applicable deadline," the project applicant can petition the federal court for an order setting "a schedule and deadline for the agency to act as soon as practicable, which shall not exceed 90 days from the date on which the order of the court is issued."  42 U.S.C. § 4336a(g)(3).  The court can set a later deadline if "necessary to comply with applicable law."  *Id.* § 4336a(g)(3)(B).

## II.    Mineral Leasing Act and Surface Mining Control and Reclamation Act

30.     Both the Mineral Leasing Act and the Surface Mining Control and Reclamation Act ("SMCRA") charge the Secretary with authorizing the mining of federally owned coal through approval of a mining plan or mining plan modification.

31.     A mining plan must assure compliance with applicable requirements of federal laws, regulations, and executive orders, and be based on information prepared in compliance with NEPA.  *See* 30 C.F.R. § 746.13.  For example, the Mineral Leasing Act compels the Department to select a mining plan that maximizes coal recovery: "no mining operating plan

7

shall be approved which is not found to achieve maximum economic recovery of the coal within the tract." 30 U.S.C. § 201(a)(3)(C).

32.    The Mineral Leasing Act requires the Secretary to approve a mining plan before a federal lessee may take "any action on a leasehold which might cause a significant disturbance of the environment." 30 U.S.C. § 207(c).

33.    SMCRA and its implementing regulations provide that the Secretary "shall approve, disapprove, or conditionally approve the mining plan."30 C.F.R. § 746.14. The Secretary of the Interior has delegated authority for such approvals to the Secretary for Land and Minerals Management.

34.    Pursuant to SMCRA's system of cooperative federalism, Montana has been delegated authority to regulate most surface coal mining activities within the state, but the law prohibits the Secretary from delegating to states the duty to approve, disapprove, or modify mining plans for federally owned coal. *See* 30 U.S.C. § 1273(c); *see also* 30 C.F.R. § 745.13(i). SMCRA also prohibits the Secretary from delegating to states authority to comply with NEPA. 30 C.F.R. § 745.13(b).

35.    While the Secretary is charged with approving, disapproving, or modifying a mining plan, OSMRE is charged with "prepar[ing] and submit[ting] to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan." *Id.* § 746.13.

### III.    Administrative Procedure Act

36.    The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

37.     Under the APA, a reviewing court shall, inter alia, "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).  Agency actions may also be set aside where the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." *Id*. § 706(2)(C)–(D).

38.     To survive review under the APA's arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotations omitted).

## IV.     The Mine

39.     The Mine is located approximately 15 miles southeast of Roundup, Montana, and includes acreage in both Musselshell and Yellowstone Counties.

40.     Coal mining began in the Bull Mountains in the early 1880s and has proceeded, relatively continuously, in various parts of the Bull Mountains since then.

41.     The Mine operates under permit SMP C1993017, which the Montana Department of Environmental Quality ("DEQ") originally issued in 1993 to Meridian Minerals.  The permit was transferred from Meridian Minerals to numerous entities, and ultimately to Signal Peak in 2008.

42.     The Mine is the only underground coal mine in Montana.

43.     The Mine uses long-wall mining and continuous mining techniques to safely and efficiently extract coal from the Mammoth coal seam.

44.     Continuous mining techniques are used to prepare access for long-wall mining. Long-wall mining shears coal from the face of rectangular panels approximately 1250 feet wide, advancing from one end to the other of the planned panel.

45.     Impacts from mining with these techniques at this location, including subsidence, hydrology, and geochemistry, are well-understood based upon approximately fifteen years of mining and observation at the Mine.

46.     Coal produced from the Mine is sold on the open international market.

47.     In general, coal is transported by rail and then via cargo ship to customers in Japan, South Korea, Chile, and Hong Kong.

**V.     AM3 Permit History**

48.     In 2008, Signal Peak applied to lease approximately 2,679.9 acres of federal coal.

49.     In 2011, the Bureau of Land Management ("BLM") prepared an environmental assessment on the application ("Coal Lease EA") and determined that the federal coal lease was not a major federal action significantly affecting the quality of the human environment.  OSMRE was a cooperating agency in the preparation of the Coal Lease EA.

50.     BLM subsequently leased the coal analyzed in the Coal Lease EA to Signal Peak.

51.     BLM's decision to lease the federal coal and the Coal Lease EA were upheld in an unpublished opinion on appeal to the U.S. Court of Appeals for the Ninth Circuit.  *Northern Plains Res. Council, Inc. v. United States Bureau of Land Mgmt.*, 725 Fed. App'x. 527 (9th Cir. Feb. 27, 2018).

52.     In 2012 Signal Peak applied for AM3, which would involve mining federal (including the coal analyzed in the Coal Lease EA), state, and private coal, which is in a checkerboard pattern of ownership within the permit area.

53.     Pursuant to SMCRA's cooperative federalism structure, the state regulatory agency, DEQ, undertook the first review of AM3.  DEQ prepared analyses required under state law pursuant to the Montana Strip and Underground Mine Reclamation Act ("MSUMRA"), Mont. Code Ann. §§ 82-4-201 to -254 and its implementing rules, ARM 17.24.301–1309.

54.     DEQ approved AM3 in 2013.

55.     OSMRE then analyzed the proposed mining plan modification for the federal coal lease.  OSMRE prepared the Bull Mountains Mine No. 1 Federal Mining Plan Modification Environmental Assessment (the "2015 Mining Plan EA"), which concluded that the federal mining plan modification would not have a significant impact on the quality of the human environment.

56.     The Assistant Secretary for Land and Minerals Management approved the mining plan modification in 2015.

57.     Mining commenced in AM3 in 2015 and continued through federal, private, and State coal under the checkerboard mineral ownership until February 2023.

58.     Special interest groups challenged the approval of the mining plan modification in federal court.  The district court granted partial summary judgment to the special interest groups and remanded the 2015 Mining Plan EA to OSMRE in 2017.  *Mont. Envtl. Info. Ctr. v. v. United States Office of Surface Mining*, 274 F. Supp. 3d 1074 (D. Mont. 2017).  The court enjoined mining in federal coal with limited exceptions.  Signal Peak continued mining non-federal coal and limited federal coal pursuant to the court's order.

59.     OSMRE prepared a new environmental assessment (the "2018 Mining Plan EA") to address the district court's 2017 ruling.  The 2018 Mining Plan EA concluded that the federal mining plan modification would not have a significant impact on the quality of the human environment.  The Assistant Secretary of Land and Minerals Management re-approved the federal mining plan in 2018.

60.     Special interest groups again challenged the approval of the mining modification in federal court.  The district court rejected many of their challenges including challenges to

OSMRE's consideration of climate change impacts, but vacated and remanded the 2018 Mining

Plan EA to address the targeted issues.  The district court did not vacate the mining plan approval

or enjoin mining federal coal.  *350 Mont. v. Bernhardt*, 443 F. Supp. 3d 1185 (D. Mont. 2020).

61.     OSMRE prepared a third environmental assessment (the "2020 Mining Plan EA")

to address the district court's 2020 ruling.  The 2020 Mining Plan EA concluded that the federal

mining plan modification would not have a significant impact on the quality of the human

environment.  The Assistant Secretary of Land and Minerals Management approved the federal

mining plan for a third time in 2020.

62.     The special interest groups appealed from the district court's 2020 decision

rejecting many of their arguments.  In 2021 the U.S. Court of Appeals for the Ninth Circuit

overruled the district court, holding that in its 2018 Mining Plan EA OSMRE had not adequately

explained why it determined that climate change impacts associated with the mining plan

approval would not be a significant impact requiring the preparation of an EIS.  *350 Mont. v.*

*Haaland*, 50 F.4th 1254 (9th Cir. 2022).

**VI.     The Determination that an EIS is Required.**

63.     The Ninth Circuit remanded the case to the district court to determine whether an

EIS would be required and, if so, to determine whether to vacate the mining plan approval

pending the preparation of an EIS.

64.     In a hearing on December 2, 2022, counsel for OSMRE stated that the agency had

determined that an EIS would be required for its NEPA review of the AM3 mining plan.

65.     In a written filing dated January 20, 2023, OSMRE acknowledged that it had

informed the court at the December 2, 2022 hearing that it had determined that an EIS is

required.

66.     OSMRE informed the court that it estimated it would take 17 months to complete the EIS, with a final decision expected to take an additional three months, for a total of 20 months.

67.     OSMRE argued to the court that the equities favored a deferred vacatur while the agency conducted the 20-month process to prepare an EIS and reach a new decision.

68.     The district court vacated the AM3 mining plan approval for mining the leased federal coal on February 10, 2023.

69.     Signal Peak may not mine the leased federal coal, which is located in a checkerboard pattern throughout the AM3 permit area unless and until OSMRE completes the AM3 EIS and the Assistant Secretary of Land and Minerals Management re-approves the mining plan.

## VII.    OSMRE's Progress on the EIS.

70.     Given OSMRE's court statements on December 2, 2022 that an EIS is required for its review of the AM3 mining plan, NEPA's two-year deadline requires that the EIS be completed by December 2, 2024.

71.     Signal Peak promptly coordinated with OSMRE to enter into a Memorandum of Understanding to fund the EIS.  Signal Peak reached out to OSMRE in December 2022 to begin coordination on funding the EIS.  Signal Peak and OSMRE executed a Memorandum of Understanding to fund the EIS on March 27, 2023.

### a.     Delayed Publication of the Notice of Intent to Prepare an EIS.

72.     In April 2023, over four months after it determined an EIS would be required, OSMRE prepared a schedule for the NEPA review that anticipated issuance of a Record of Decision by July 2024.  OSMRE's schedule indicated the Notice of Intent would be published in May 2023.

73.     The Notice of Intent was not published in May 2023.

74.     Signal Peak was informed by OSMRE that the agency could not meet the schedule to publish the Notice of Intent because the one-page document required review by the Department's Solicitor's Office.

75.     On August 7, 2023, over eight months after it determined that an EIS was necessary, OSMRE published a Notice of Intent to prepare an EIS for its review of the AM3 mining plan.

76.     OSMRE held a public scoping meeting and accepted public comments through September 6, 2023.

> **b.      Failure to Identify Alternatives.**

77.     On information and belief, in the spring of 2023, Department leadership assumed the task of developing the alternatives to be analyzed in the EIS and in NEPA reviews for unrelated coal mines.  The alternatives for these different mines would be developed on a programmatic basis.

78.     For approximately six months throughout the summer and fall, Signal Peak's contacts at OSMRE consistently informed Signal Peak that the Department leadership had not yet determined the alternatives to be used in the EIS.

79.     OSMRE informed Signal Peak in a meeting the week of December 18, 2023 that OSMRE had finally received guidance from the Department's leadership regarding alternatives.

80.     Over six weeks later, Signal Peak has still not been informed whether alternatives for the EIS have actually been selected or what the alternatives will be.

> **c.      Five-Month Delay Due to Selection to the NEPA Review Team.**

81.     In May 2023, the AM3 EIS was selected to be part of the Department's NEPA Review Team.

82.     To the best of Signal Peak's knowledge, and although the Department had undertaken to prepare alternatives for federal coal mine NEPA reviews on a programmatic basis, the AM3 EIS is the only one of the three environmental analysis documents OSMRE is preparing on projects related to leased federal coal in Montana selected to be part of the Department's NEPA Review Team.

83.     Signal Peak has never been informed why the AM3 EIS was selected to be part of the Department's NEPA Review Team.

84.     Although the Department's public statements about the NEPA Review Team indicate that it is intended to streamline reviews, OSMRE informed Signal Peak that the selection of the EIS to be part of the NEPA Review Team would add four months to the schedule.  OSMRE informed Signal Peak that the delay was directly attributable to the selection of the EIS to be part of the NEPA Review Team.  In light of that change, OSMRE projected that the Record of Decision would be issued in January 2025.

85.     Signal Peak learned in January 2024 that another month of delay would be added to the schedule because the Department's NEPA Review Team had requested an optional "Step 1a" briefing after the completion of the scoping process.  OSMRE informed Signal Peak that the optional "Step 1a" briefing would add an additional month to the schedule.

86.     This aggregate five-month projected delay due to inclusion in the Department's NEPA Review Team pushed the anticipated schedule beyond NEPA's two-year deadline.

87.     OSMRE did not consult with Signal Peak regarding establishing a new deadline when it selected the EIS to be part of the NEPA Review Team or when it requested the optional "Step 1a" briefing that further delayed the EIS.

### d. 18-Month (and Counting) Delay Due to Resistance to Using Existing Analysis.

88.     At the local level, OSMRE has stalled work on the AM3 EIS since July 2023 because it is resistant to using analysis prepared by DEQ in its reviews of the mining plan.

89.     Even though OSMRE has already completed three different EAs to evaluate impacts of the mining plan and has responded to all deficiencies identified by the courts except the climate change analysis, OSMRE decided it should re-create DEQ's prior analysis of site-specific impacts of the mining plan to water, soils, and other resources.

90.     On July 31, 2023, eight months after it determined an EIS would be required, and notwithstanding having already received supplemental analysis from DEQ, OSMRE issued a change order to add new analyses repeating the work already done by DEQ.  In light of that change, OSMRE projected that the agency would complete the EIS and issue the Record of Decision in March 2025.

91.     OSMRE did not consult with Signal Peak regarding establishing a new deadline when it revised its schedule and projected that the agency would complete the EIS and issue the Record of Decision three months after the statutory deadline.

92.     Given the substantial analysis of the questions raised by OSMRE that had already been completed by DEQ in its permitting review, Signal Peak questioned the need for the change in scope and requested a more detailed proposal.

93.     OSMRE asserted that it could not use DEQ's prior analysis unless DEQ participated as a cooperating agency and OSMRE requested DEQ do so.

94.     With the question of DEQ's participation still unresolved, OSMRE issued a new schedule on October 4, 2023, projecting that the agency would complete the EIS and issue the Record of Decision in June 2025.

95.     OSMRE did not consult with Signal Peak regarding establishing a new deadline when it revised its schedule and projected that the agency would complete the EIS and issue the Record of Decision six months after the statutory deadline.

96.     In a November 3, 2023 letter, DEQ explained that it considers questions on which OSMRE is seeking supplemental analysis to be resolved because ongoing monitoring during mining after DEQ's original approval have "confirmed that the predictions made in the original permit applications are valid."

97.     DEQ offered to be a cooperating agency if OSMRE would agree to:

    a.  Meet the June 2025 deadline to complete the EIS and release a decision.

    b.  Formally adopt and rely on relevant materials already prepared by DEQ in Signal Peak's permit applications.

    c.  Rely on additional analysis DEQ prepared at OSMRE's request in July 2023.

    d.  Prepare a scope of work outlining any anticipated additional analysis outside of the analysis DEQ prepared for Signal Peak's permit applications.

98.     OSMRE informed DEQ and Signal Peak that it was unable to meet DEQ's conditions.

99.     In December 2023, OSMRE provided a new schedule projecting that the agency would complete the EIS and issue the Record of Decision in July 2025.

100.    OSMRE did not consult with Signal Peak regarding establishing a new deadline when it revised its schedule and projected that the agency would complete the EIS and issue the Record of Decision seven months after the statutory deadline.

101.    OSMRE has informed Signal Peak that the schedule will continue to be delayed until it reaches a resolution with DEQ about the scope of the EIS and DEQ's role in preparing the EIS.

102.    As of this filing, OSMRE has informed Signal Peak that it has a verbal agreement with DEQ regarding its role, but OSMRE has not provided written confirmation, nor has it confirmed to Signal Peak that the agency has begun or is planning to undertake substantive work on the EIS.

103.    On January 31, 2024, OSMRE informed Signal Peak that the limited work the agency had completed in the 14 months since the agency determined an EIS is necessary may need to be repeated because of the agency's delays in moving forward with the EIS.

104.    OSMRE staff persons have indicated to Signal Peak that they are considering seeking permission from OSMRE leadership for a "pause" in the EIS schedule because they do not believe they will complete the EIS within two years of the date OSMRE issued the Notice of Intent to prepare the EIS.

105.    On February 6, 2024, after weeks of delays to even provide an updated schedule, OSMRE issued a new schedule that projects the agency will complete the EIS and issue a Record of Decision in late May 2026, with a final Department decision to follow in July 2026.  OSMRE did not provide an explanation for the new eleven-month delay.

106.    OSMRE did not consult with Signal Peak regarding establishing a new deadline when it revised its schedule and projected that the agency would complete the EIS and issue the Record of Decision 18 months after the statutory deadline.

107.    In total, OSMRE now projects that it will not complete the EIS and issue the Record of Decision until three and a half years after it determined an EIS was required.

**VIII.    Impact of OSMRE's Delay on Signal Peak.**

108.    Since the district court vacated the AM3 mining plan approval in February 2023, Signal Peak has been precluded from mining its leased federal coal in AM3, causing substantial disruption to operations.

109.    The leased federal coal is located in a checkerboard pattern within the AM3 permit area, often at a diagonal to the mining panels, such that avoiding federal coal requires also avoiding state or private coal on the other side of the diagonal.

110.    To avoid mining federal coal after the district court's vacatur order, Signal Peak was forced to construct new equipment removal access points short of the planned length of the panel it was mining at the time.  Remaining private and federal leased coal was sterilized, which means that it is not feasible to mine the bypassed coal with existing techniques.

111.    To avoid sterilizing additional federal, state, or private coal, Signal Peak has been forced to modify its mining plan and apply to DEQ for multiple amendments to its mining permit to access non-federal coal in other areas of the Mine.  These actions were costly and inefficient, but they have allowed Signal Peak to continue operations and preserve the livelihoods of its 260 full-time employees and 40 full-time contract employees.  These actions were possible only because of highly favorable market conditions that rendered the extra costs required for these actions economic.

112.    Such stopgap measures can only go so far.  Signal Peak does not control market prices.  If market conditions materially worsen before OSMRE completes its analysis of AM3 such that Signal Peak's replacement mining operations are no longer economic or if OSMRE does not complete its analysis before Signal Peak completes its replacement mining operations, Signal Peak may be forced to close the mine and lay off workers.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of NEPA and the APA – Failure to Act in Accordance with Statutory Deadline)**

113.    Signal Peak incorporates the prior allegations as if fully set forth herein.

114.    NEPA provides that "a lead agency shall complete . . . the [EIS] not later than the date that is 2 years after the sooner of, as applicable . . . the date on which such agency determines that [NEPA] requires the issuance of an [EIS] with respect to such action . . . [and] the date on which such agency issues a notice of intent to prepare the [EIS] for such action."  42 U.S.C. § 4336a(g)(1)(A).

115.    On December 2, 2022 OSMRE stated in federal court that it had determined an EIS is required for its review of AM3.

116.    NEPA therefore requires OSMRE to complete the EIS by December 2, 2024.

117.    On February 6, 2024, OSMRE issued a new schedule that projects the agency will complete the EIS and issue a Record of Decision in late May 2026, three and a half years after it determined an EIS is required.

118.    OSMRE is not conducting its review of the AM3 EIS "in accordance with [the] applicable deadline" because it does not project that it will comply with the statutory deadline of December 2, 2024.

119.    If an agency determines it cannot meet the two-year deadline, it may be extended, "in consultation with the applicant," but only for "so much additional time as is necessary to complete such [EIS]."  *Id.* § 4336a(g)(2).

120.    OSMRE has never consulted with Signal Peak regarding an extension of the deadline.

121.    Where an agency fails to "act in accordance with an applicable deadline" the project applicant can petition the federal court for an order setting "a schedule and deadline for the agency to act as soon as practicable, which shall not exceed 90 days from the date on which the order of the court is issued."  42 U.S.C. § 4336a(g)(3).

122.    Signal Peak is entitled to an order from the Court to "set a schedule and deadline" for OSMRE to act to ensure compliance with the statutory deadline.

## **PRAYER FOR RELIEF**

WHEREFORE, Signal Peak respectfully requests that the Court:

A.    Declare that the Federal Defendants are in violation of NEPA by failing to act in accordance with an applicable deadline in the preparation of the EIS for AM3.

B.    Order OSMRE to develop and submit to the Court within 14 days a schedule to complete the EIS by December 2, 2024, to ensure compliance with NEPA's two-year deadline from the date OSMRE determined an EIS is necessary.

C.    Order OSMRE to submit monthly status updates to the Court regarding the agency's progress toward complying with the statutory deadline to complete the EIS.

D.    Issue such additional relief as Signal Peak subsequently requests or that this Court may deem just, proper, and equitable.

Dated this 7th day of February, 2024.

*/s/* Sarah C. Bordelon

Sarah C. Bordelon
Holland & Hart LLP
5441 Kietzke Lane, Second Floor
Reno, NV  89511
Telephone: (775) 327-3000
scbordelon@hollandhart.com

Hadassah M. Reimer
P.O. Box 68
Jackson, WY  83001
Phone: (307) 739-9741
Fax: (307) 739-9744
hmreimer@hollandhart.com

**ATTORNEYS FOR SIGNAL PEAK ENERGY, LLC**