UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIGNAL PEAK ENERGY, LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>DEB HAALAND, et al.,<br><br>        Defendants. | Civil Action No. 24-cv-366 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Signal Peak Energy, LLC, sued the Office of Surface Mining Reclamation and Enforcement, the Department of the Interior, and several agency officials, alleging that they violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") by planning to complete the Environmental Impact Statement ("EIS") for its coal mine expansion after the statutory deadline expired. The Government moved to dismiss, arguing that the case is not ripe and Plaintiff failed to state a claim. Plaintiff subsequently sought a preliminary injunction, asking the court to require the Government to create a within-deadline schedule for the EIS and ensure its compliance with that schedule. Several conservation groups have moved to intervene. The court heard argument on the motions on July 8, 2024.

Having considered the record, the briefs, and oral argument, the court will GRANT in part and DENY in part Defendants' Motion to Dismiss, DENY in part the conservation groups' Motion to Intervene; and DENY as moot Plaintiff's Motion for a Preliminary Injunction.

Page **1** of **20**

I. **BACKGROUND**

A. **Legal Background**

NEPA requires agencies to prepare environmental documents for most proposed final agency actions. 42 U.S.C. § 4336(a). The environmental document required depends on the proposed action's potential effect on the environment. An agency must "issue an environmental impact statement with respect to a proposed agency action . . . that has a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1). By contrast, if the agency action "does not have a reasonably foreseeable significant effect on the quality of the human environment," the agency "shall prepare an environmental assessment." *Id.* § 4336(b)(2).

If an agency determines an EIS is required, the government shall "develop a schedule, in consultation with each cooperating agency, the applicant, and such other entities as the lead agency determines appropriate for" its completion. *Id.* § 4336a(a)(2)(D). An EIS is generally due "not later than the date that is 2 years after the sooner of" the date the agency determines an EIS is necessary, "the date on which the agency notifies the applicant" that its application to establish a right-of-way is complete, and the date the "agency issues a notice of intent." *Id.* § 4336a(g)(1)(A). If, however, the agency "determines that it is not able to meet the deadline," it may "extend such deadline, in consultation with the applicant, to establish a new deadline that provides only so much additional time as is necessary to complete such environmental impact statement." *Id.* § 4336a(g)(2).

NEPA grants the "project sponsor" a cause of action to "obtain review of an alleged failure by an agency to act in accordance with an applicable deadline" upon "filing a written petition with a court of competent jurisdiction." *Id.* § 4336a(g)(3)(A). "If a court . . . finds that an agency has failed to act in accordance with an applicable deadline, the court shall set a schedule and deadline for the agency to act as soon as practicable." *Id.* § 4336a(g)(3)(B).

B.   **Factual and Procedural Background**

Plaintiff owns and operates the Bull Mountains No. 1 Mine, an underground coal mine in Montana. Compl., ECF No. 1 ¶ 16. In 2012, Plaintiff applied to expand the mine. *Id.* ¶ 52. This expansion—known as AM3—proposed mining federal, state, and private coal. *Id.* After completing an environmental assessment, the Government concluded that AM3 would not have a significant impact on the environment, *id.* ¶ 55, and therefore would not require an EIS. It approved AM3, and mining commenced in 2015. *Id.* ¶¶ 56–57.

Several conservation groups, however, challenged AM3's approval in Montana federal court. *Id.* ¶ 58; *see Mont. Elders for a Livable Tomorrow et al. v. Off. of Surface Mining et al.*, No. 15-cv-106-DWM (D. Mont.). During that litigation, the Government prepared two additional environmental assessments, in 2018 and 2020, once again concluding AM3 would not have significant impact on the environment and approving the expansion. Compl. ¶¶ 59–61. Following plaintiffs' successful appeal to the Ninth Circuit, the Government represented in a December 2, 2022, district court hearing that an EIS would be required for AM3. *Id.* ¶¶ 62–65. Plaintiff represents that December 2, 2022, is therefore the trigger date for the Government's two-year statutory deadline to complete the EIS. *See id.* ¶ 70; 42 U.S.C. § 4336a(g)(1)(A). After significant back and forth over the EIS process and timeline, in February 2024, the Government issued an EIS schedule that projected completion in late May 2026. Compl. ¶ 105. The Government "did not consult with Signal Peak" regarding this new schedule. *Id.* ¶ 106.

The vacatur of AM3's approval disrupted Plaintiff's operations and mining plan. *Id.* ¶ 108. In response, Plaintiff applied for multiple amendments to its mining permit to access non-federal coal in other areas of the mine. *Id.* ¶¶ 110–11. Plaintiff represented that this new mining

plan will keep the mine operational through the end of 2025. *See* Tr. of Proceedings, ECF No. 43 at 33:21–24.

Plaintiff also initiated this action on February 7, 2024, claiming the Government violated NEPA and the APA by delaying the EIS and failing to act in accordance with the statutory deadline. Compl. ¶¶ 113–22. The Government moved to dismiss, ECF No. 10, Plaintiff filed a motion for a preliminary injunction, ECF No. 18, and several conservation groups filed a motion to intervene, ECF No. 12.

## II.   LEGAL STANDARD

### A.   Motion to Intervene

Federal Rule of Civil Procedure 24 provides for two kinds of intervention—intervention as of right and permissive intervention. Intervention as of right requires a court to allow intervention upon: (1) a "timely motion"; (2) by a person or entity who "claims an interest relating to the property or transaction that is the subject of the action," and (3) who "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2). Such a person or entity is not entitled to intervene as of right, however, if "existing parties adequately represent" their interest in the action. *Id.* Permissive intervention authorizes a court to allow intervention upon a "timely motion" by a person or entity who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). "In exercising its discretion" to permit intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

### B.     Motion to Dismiss

#### i.     Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss any claim for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A live case or controversy is critical to the court's subject matter jurisdiction. *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64, 67 (1997). In assessing a motion to dismiss, the court "accepts all of the factual allegations in the complaint as true," *Jerome Stevens Pharms. Inc. v. FDA*, 402 F.3d 1249, 1250 (D.C. Cir. 2005) (citation omitted), and construe the complaint "in the light most favorable to" the non-moving party, *Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C. Cir. 2011). That said, because the court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," the "factual allegations in the complaint . . . will bear closer scrutiny [than those allegations would] in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quotation marks and citation omitted). Moreover, the court need not accept "legal conclusions that are cast as factual allegations." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) (citation omitted).

#### ii.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citation omitted). The court presumes the truth of the complaint's factual allegations, *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), but need not "accept as true a legal conclusion couched as a factual allegation," nor "inferences [that] are unsupported by the facts set out in the complaint," *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).

C.  **Motion for a Preliminary Injunction**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted). A movant must demonstrate (i) a likelihood of success on the merits, (ii) a likelihood of irreparable harm absent injunctive relief, (iii) that the balance of equities tips in their favor, and (iv) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Councils, Inc.*, 555 U.S. 7, 20 (2008). The movant bears the burden of showing that "all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). To satisfy its burden, a movant may rely on "evidence that is less complete than in a trial on the merits" so long as it is "credible." *R.I.L–R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (citations omitted).

### III.  MOTION TO INTERVENE

A.  **Intervention Requires Standing**

In this Circuit, proposed intervenors must demonstrate Article III standing. In *Yocha Dehe v. United States Department of the Interior*, 3 F.4th 427, 430–32 (D.C. Cir. 2021), the D.C. Circuit affirmed the district court's denial of a motion to intervene because Yocha Dehe lacked Article III standing. In doing so, the court explained that, to intervene as of right, "the movant must demonstrate that it has standing under Article III of the U.S. Constitution." *Id.* at 430

(citation omitted). Concluding that Yocha Dehe lacked standing, the court declined to reach the issue of permissive intervention. *See id.* at 432.

*Yocha Dehe*'s holding, however, is in tension with the Supreme Court's decision in *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ("*Little Sisters*"). There, the Court explained that "[a]n intervenor as of right must independently demonstrate Article III standing if it pursues relief that is broader or different from the party invoking a court's jurisdiction," but "inquiring into the" proposed intervenor's standing is improper if that intervenor seeks the same relief as a party with standing. *Id.* at 2379 n.6. But *Yocha Dehe*—decided one year after *Little Sisters*—did not consider whether the proposed intervenor sought the same relief as the existing parties or discuss *Little Sisters*. Although the D.C. Circuit has not addressed this tension, this court is bound by the decision latest in time— here, *Yocha Dehe*. *See, e.g.*, *Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005) (even panels of the D.C. Circuit are "bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court"); Henry J. Dickman, Note, *Conflicts of Precedent*, 106 Va. L. Rev. 1345, 1392 (2020) ("Both the Supreme Court and court of appeals precedents are vertical with respect to the district court, and thus, the more directly applicable decision binds the district judge.").

"To establish standing under Article III, a prospective intervenor—like any party—must show (1) injury-in-fact, (2) causation, and (3) redressability." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732–33 (D.C. Cir. 2003). An entity can allege injury either by showing that the challenged action harms its organizational interests (organizational standing), or by showing that at least one of its members has individual standing (associational standing). The conservation groups seek associational standing.

An environmental organization may establish associational standing by demonstrating that "(a) its members [or any one of them] would otherwise have standing to sue in their own right; (b) the interests [the entity] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

An injury in fact "must be 'concrete, particularized, and actual or imminent.'" *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (citation omitted). The imminence requirement means that even if an injury has not yet occurred, it must be "*certainly* impending," *id.* (citation omitted; emphasis in original), or there is a "substantial risk" of the harm occurring, *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (citation omitted). "'Allegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted; emphasis in original). Applying that framework, the D.C. Circuit has found an injury in fact in several cases where entities have aesthetic and recreational interests in specific areas of land or species that may be harmed by agency action. *E.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 593 (D.C. Cir. 2019) (aesthetic and recreational interest in observing whooping cranes); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) ("recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests" in "observing the Valley Elderberry Longhorn Beetle in its natural California habitat"); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (members had aesthetic interests in the land surrounding West Antelope II tracts, where an agency had authorized mining that would

increase "local air, water and land pollution"). But injury is not imminent if it rests on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414.

Procedural statutory violations may also confer an injury in fact if "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right" and the person has "been concretely harmed by" the violation. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (citation and emphasis omitted). In *TransUnion LLC*, the Supreme Court explained that a Maine citizen whose land was polluted by a nearby factory would have an injury in fact to sue the factory for violating environmental laws and damaging her property, but a citizen in Hawaii would not, because the Hawaiian had not "suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2205–06.

Next, the causation or traceability element requires that a party be responsible for the movant's injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). For example, in *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023), plaintiff's injury—denial of access to evidence for DNA testing—was traceable to defendant's conduct because defendant was the state prosecutor who denied plaintiff access to the evidence. By contrast, in *California v. Texas*, 141 S. Ct. 2104, 2113–14 (2021), in which plaintiffs challenged the constitutionality of the minimum essential coverage provision of the Affordable Care Act, the Court held that individual plaintiffs' injury—making payments necessary to carry the minimum essential coverage—was not traceable to the statute because the statute had "no means of enforcement" if plaintiffs failed to comply.

In procedural violation cases, this second element of standing bears particular importance. *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 592. A plaintiff "need not show that a harm to a member 'has in fact resulted from the [agency's] procedural failures,'" but rather that

"there is a 'substantial probability'" that the challenged agency action caused plaintiff's injury. *Id.* (citation omitted). This inquiry requires two causal links: one connecting the procedural deficiency to the substantive agency action, and another connecting that substantive agency action to plaintiff's injury. *Ctr. for Biological Diversity*, 861 F.3d at 184.

Finally, to allege redressability, a plaintiff must show that it is "substantially likely" that, if it succeeds on the merits, the suit will result in "relief that directly redresses the injury suffered." *Reed*, 143 S. Ct. at 960 (citation omitted); *see Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019) (plausibility standard). "The key word is 'likely.'" *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (quoting *Lujan*, 504 U.S. at 561). For example, in *Reed*, 143 S. Ct. at 960, the Supreme Court concluded that plaintiff had standing because the state prosecutor was "substantially likely" to "abide by . . . a court order" finding that his "justification" for withholding the evidence violated due process. By contrast, in *Lujan*, 504 U.S. at 568–71, the Court held that plaintiff could not show redressability because the "only" way to redress plaintiff's injury was for individual agencies to terminate funding of certain activities abroad until they consulted on environmental impacts, but the agencies at issue were not parties to the suit, and "any relief the [court] could have provided in this suit . . . was not likely to" result in redress. Consequently, "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44 (1976).

**B.      Conservation Groups Lack Standing**

The conservation groups frame their injury in fact in two ways: (1) injury arising from the Government's alleged procedural violation of NEPA, and (2) injury arising from its interest in the integrity of the EIS process and protecting the environment that is endangered by

Plaintiff's request that the AM3 EIS be completed by December 2024. Mot. to Intervene, ECF No. 12 at 18–20. Neither allegation confers Article III standing.

    i.    *Procedural injury*

The conservation groups do not have an injury in fact arising from the alleged NEPA violation at issue here. Plaintiff alleges that the Government has violated NEPA by failing to "act in accordance with" the two-year deadline to complete the EIS. Compl. ¶¶ 114–22; *see* 42 U.S.C. § 4336a(g). NEPA provides the "project sponsor" a cause of action to review "an alleged failure by an agency to act in accordance with" this deadline. 42 U.S.C. § 4663a(g)(3)(A). The conservation groups do not contend they are the project sponsor. Consequently, they were not authorized by Congress to "sue to vindicate" the project sponsor's right to a timely EIS, and they do not have an injury in fact arising from the alleged violation of that procedural provision. *See TransUnion LLC*, 141 S. Ct. at 2205 (citation omitted).

The conservation groups argue that they have a statutorily protected interest in the EIS at issue in this case. Reply in Supp. of Mot. to Intervene, ECF No. 38 at 6–13. The issues of whether an EIS will be conducted, or whether the Government will afford conservation groups the required time to comment on a draft EIS, however, are not at issue here. The only procedural provision at issue concerns the timeline for completing the EIS. That provision does not appear to have been designed with conservation groups in mind, nor does the NEPA grant them a cause of action to sue for alleged violations of it.

    ii.    *The EIS process and the environment*

The conservation groups do not have an injury in fact arising from their interests in the environment and the EIS process either, because there does not appear to be any "actual or imminent" harm to the environment or to the integrity of the EIS process, *see Clapper*, 568 U.S.

at 409 (citation omitted).  Their theory is that, if the court orders the Government to complete the EIS on a shorter timeline, the Government may cut corners by either failing to comprehensively review AM3's potential environmental impacts or failing to give the public sufficient time to review and comment on the draft EIS.  To be sure, if the court orders the Government to move up its timeline for completing the EIS by more than a year, the Government will need to rework its timeline significantly.  It is possible that this process could result in a less thorough environmental review or less time for public comment.  But a "*possible* future injury" is insufficient to confer an injury in fact.  *Id.* (citation omitted; emphasis in original).  The conservation groups have not identified a "*certainly* impending" injury, *id.* (citation omitted; emphasis in original), or even an injury there is a "substantial risk" will occur, *N.Y. Republican State Comm.*, 927 F.3d at 504 (citation omitted).

        The conservation groups' arguments to the contrary are unpersuasive.  First, they argue that the Montana district court's decision that they had standing to challenge the AM3 approval is binding under collateral estoppel.  Mot. to Intervene at 18.  Not so.  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Klayman v. Rao*, 49 F.4th 550, 553 (D.C. Cir. 2022) (citation omitted).  Although this case involves some of the same parties as the Montana litigation, that court did not decide the same "issue of fact or law" presented in this case.  Rather, the Montana district court held that the Montana Environmental Information Center—one of the conservation groups moving to intervene here—had standing to challenge AM3's approval because a member had "aesthetic, personal, and recreational interests in the Bull Mountains" that would "certainly be lessened by the proposed expansion of the mine."  *Mont. Env't Info. Ctr. v. U.S. Off. of Surface Mining*, 274

F. Supp. 3d 1074, 1086 (D. Mont. 2017). The question in this case is whether the conservation groups have an interest in the timeline for the EIS to be completed; not whether they have an interest in the proposed expansion of the mine.

The conservation groups also conflate their interests with Plaintiff's, arguing that this case is premised on the "real-world consequences" for Plaintiff's mine. Reply in Supp. of Mot. to Intervene at 16. But the conservation groups' interests are different from Plaintiff's. Plaintiff seeks to continue operating a mine and the conservation groups seek to protect the environment and participate in the EIS process. Moreover, Plaintiff has already suffered real-world consequences by recalibrating its mining plan and seeking additional mining permits. Compl. ¶¶ 108–11. Considering Plaintiff's hardships does not support standing for the conservation groups.

In sum, the conservation groups lack standing, and the court will therefore deny their motion to intervene.

### C.   Amicus Status

The conservation groups request that, if the court denies their motion to intervene, it consider them amici and convert their brief on the merits to an amicus brief. Reply in Supp. of Mot. to Intervene at 24. The court will grant conservation groups' request and grant leave to file its opposition to Plaintiff's motion for a preliminary injunction, ECF No. 23, as an amicus brief. *See* Local Civil Rule 7(o).

### IV.   MOTION TO DISMISS

### A.   Constitutional Standing and Ripeness

The Government argues that the court lacks jurisdiction because the case is not ripe. "Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l*

*Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). Consequently, "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.* at 1428; *accord Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).

Unlike the conservation groups, Plaintiff seeks to establish organizational, rather than associational standing. An entity may establish organizational standing if it alleges "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In *Havens Realty*, the Supreme Court found that plaintiff had alleged injury in fact by claiming that defendant's "steering practices have perceptibly impaired [the plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* An entity's "abstract interest in a problem," by contrast, "is insufficient to establish standing, 'no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem.'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). To establish either constitutional standing or ripeness, Plaintiff must allege an imminent injury to its activities and compensatory drain on its resources.

Plaintiff's procedural injury is sufficiently imminent to satisfy Article III.[1] In cases where a plaintiff asserts a procedural injury, "courts have applied the imminence requirement to

---

[1] Plaintiff claims it has already been injured by the Government's failure to "act in accordance with" the December 2024 EIS deadline by setting a schedule that forecasts completion in 2026. Mem. in Opp'n to Mot. to Dismiss, ECF No. 14 at 11–14; *see* 42 U.S.C. § 4336a(g)(3). NEPA, however, requires only that the Government "complete" the EIS "not later than the date

the procedural violation, not the discrete injury that might someday flow" from it. *Nat'l Treasury Emps. Union*, 101 F.3d at 1430–31 (citing *Lujan*, 504 U.S. at 572 n.7). The procedural violation at issue is the requirement that the Government create an EIS within two years. 42 U.S.C. § 4336a(g)(1); *see supra* n.1. The Government has created an EIS schedule that forecasts completion in May 2026, but Plaintiff alleges the deadline is December 2, 2024. Compl. ¶¶ 6, 70. The Government has not indicated that it does not plan to follow this schedule, or that it intends to complete the EIS by December 2, 2024, without a court order. *See* Tr. for Proceedings at 54:2–7 ("the deadline" proposed in an EIS schedule typically only "gets extended"). And imminence does not require "literal certainty." *N.Y. Republican State Comm.*, 927 F.3d at 504. Here, there is a "substantial risk" of the Government's anticipated procedural violation. *See id.*

Plaintiff also has alleged the necessary drain on its resources. Indeed, it has already expended resources to compensate for the imminent procedural violation by obtaining a permit to mine an additional area—AM6—to keep the mine operable through 2025. Tr. of Proceedings at 33:21–24. Once AM6 is mined, however, Plaintiff's operation will be in jeopardy and its employees will be out of work unless it identifies additional areas to mine that do not involve AM3 federal coal. *See id.* at 31:11–34:19. Accordingly, Plaintiff has alleged an injury in fact as an organization.

---

that is 2 years after" the triggering event. 42 U.S.C. § 4336a(g)(1)(A). The cause of action provision, which authorizes the project sponsor to sue for "an alleged failure by an agency to act in accordance with an applicable deadline," *id.* § 4336a(g)(3)(A), does not provide a cause of action until the agency has allegedly failed to meet this two-year deadline. Moreover, because NEPA provides an EIS deadline, and the Government's EIS schedule is not final agency action, *infra* at 19, the APA's standard of review is inapplicable. *See* 5 U.S.C. § 704 (providing an APA cause of action for "final agency action for which there is no other adequate remedy in a court").

Plaintiff's injury is also fairly traceable to the Government's actions and may be redressed by a favorable outcome in this case. Because much of AM3 contains patches of federal coal, Plaintiff cannot continue to mine it until the Government completes the EIS. Thus, there is a "substantial probability" that the imminent procedural violation will harm Plaintiff, *see Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 592 (citation omitted), by forcing it to obtain permits for new areas to mine or close its operation completely, *id.* at 31:11–34:19. Moreover, it is "substantially likely" that, if Plaintiff succeeds on the merits, the court will order "relief that directly redresses the injury suffered" by requiring the Government to comply with the two-year EIS deadline and enabling Plaintiff to move forward with mining AM3 within its anticipated timeline. *See Reed*, 143 S. Ct. at 960 (citation omitted).

The Government disagrees, first arguing that Plaintiff's injury is not imminent because the potential procedural violation "is months away." Mot. to Dismiss at 9 (citing *Nat'l Treasury Emps. Union*, 101 F.3d at 1431). But the Government has no support for such a bright line rule. In *National Treasury Employees Union*, 101 F.3d at 1431, the Court held that a challenge to the Line Item Veto Act was not imminent because the veto power was "not only unexercised," but was "as yet unavailable," and there was no appropriations bill subject to the veto pending before Congress. This case is different because the Government is already on track to miss an EIS deadline. Whether that deadline is days or months away may be relevant to the imminence inquiry, but it is not itself dispositive.

The Government also argues that the harm Plaintiff has suffered is traceable not to the Government's actions, but to the Montana district court's decision vacating the AM3 approval after the Government agreed that an EIS was required. Reply in Supp. of Mot. to Dismiss, ECF No. 20 at 2–4. This argument misstates Plaintiff's allegations. Plaintiff contends that it

recalibrated its mining plan after the Montana court decision with the understanding that the EIS would be completed in December 2024, Compl. ¶¶ 84, 108–10, but then had to reevaluate its plan upon learning the EIS was not projected to be completed until 2026, *id.* ¶¶ 105, 111.  At the motion to dismiss stage, the court must presume the truth of the factual allegations in the Complaint.  *Sparrow*, 216 F.3d at 1113; *see supra* Section II.B.ii.

**B.      Prudential Ripeness**

Ripeness doctrine also contains a prudential component that encourages courts not to prematurely decide "abstract disagreements" and to "protect the other branches" of government "from judicial interference until their decisions are formalized and their 'effects felt in a concrete way by the challenging parties.'"  *Nat'l Treasury Emps. Union*, 101 F.3d at 1431 (citation omitted).  The D.C. Circuit applies a two-part test for prudential ripeness, asking (1) whether the issues are fit for a judicial decision and (2) whether the parties will suffer hardship if the court withholds consideration.  *Id.* (citation omitted).  The "fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'"  *Am. Petroleum Inst.*, 683 F.3d at 387 (citation omitted).  Thus, under the fitness prong, courts "decline to review 'tentative' agency positions."  *Id.* (citation omitted).  In considering hardship, moreover, courts ask whether it would be "immediate and significant."  *Id.* at 389 (citation omitted).

Applying this framework, the D.C. Circuit found the claims in *American Petroleum Institute* prudentially unripe because the agency had proposed a new rule that would eliminate aspects of the challenged rule.  *Id.* at 387.  The Court reasoned that the proposed rule would "narrow the legal issues involved" and "provide a more final and concrete setting for deciding any issues left on the table."  *Id.* at 388; *accord Nat'l Treasury Emps. Union*, 101 F.3d at 1431

("[W]hile the broad legal theory . . . may be as complete as it ever will, the facts upon which its resolution may depend are not 'fully crystallized,' nor do the [plaintiffs] feel their effects in a concrete way."). Regarding hardship, the Court concluded that although there was a possibility of "some financial hardship," plaintiff did not show "such a burden as to warrant a potentially improvident decision of an otherwise unripe issue." *Am. Petroleum Inst.*, 683 F.3d at 390; *accord Nat'l Treasury Emps. Union*, 101 F.3d at 1431 (potential diversion of resources was "light hardship"). By contrast, the Court concluded *Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105, 1113 (D.C. Cir. 2001), was prudentially ripe because the agency decision approving the challenged merger was final and "the standards for assessing the Commission's judgment" were "clear and easy to apply." *Accord La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 398 (D.C. Cir. 2008) (case ripe because agency decision was not "conditional"); *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 408 (D.C. Cir. 2013) (case ripe because pending agency rule would not affect legal issue challenged and pollution would result in the interim if decision was delayed).

This case is prudentially unripe. First, it is not yet fit for a judicial decision because a critical fact is not fully crystallized: the Government has not yet missed the alleged EIS deadline. Although it seems unlikely, the Government still could take the initiative to reconfigure its schedule to meet the deadline or obtain Plaintiff's consent to extend the EIS timeline, *see* 42 U.S.C. § 4336a(g)(2) ("A lead agency that determines it is not able to meet the deadline . . . may extend such deadline, in consultation with the applicant."). Consequently, if the court does not decide the merits now, it "may never need to," *Nat'l Treasury Emps. Union*, 101 F.3d at 1431.

Second, Plaintiff is not likely to suffer further hardship if the court defers its review until the alleged EIS deadline elapses. Plaintiff has already expended resources to prepare for the

likely event that the Government will not complete the EIS by December 2024, making further hardship unlikely.  *See* Tr. of Proceedings at 31:11–34:19; *supra* at 18.  And even if Plaintiff does expend some additional resources to account for the protracted litigation, those resources are unlikely to present "such a burden as to warrant a potentially improvident decision of an otherwise unripe issue."  *Am. Petroleum Inst.*, 683 F.3d at 390.

Plaintiff disagrees on both prongs.  Regarding fitness for review, it argues that the facts are fully crystallized because "there are no facts to suggest that the agency has any intent to shorten" the EIS schedule.  Mem. in Opp'n to Mot. to Dismiss, ECF No. 14 at 17 ("Dismissal Opp'n").  Although it may be unlikely that the Government will complete the EIS by December 2024, its current schedule is not the kind of final agency action that "mark[s] the consummation" of the agency's decisionmaking and is typically subject to immediate judicial review.  *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (interpreting "final agency action" under the APA); *see also Wabash Valley Power Ass'n*, 268 F.3d at 1113 (final agency action is fit for judicial decision).

Plaintiff relatedly contends that consulting with the Government to extend the deadline under § 4336a(g)(2) would be "would be meaningless" because consultation "requires seeking the opinion of another with an opportunity to affect the outcome," which Plaintiff claims the Government has not done and will not do going forward.  Dismissal Opp'n at 17–18.  It may be that the Government—or Plaintiff—refuses to engage in good faith as the deadline nears.  But that does not undermine the fact that no deadline has passed, and the facts of this case will not be "fully crystallized" until it has.

Plaintiff also argues that "existing harms will be exacerbated" without immediate relief.  Dismissal Opp'n at 16 (citing Compl. ¶¶ 108–12).  But the paragraphs of the Complaint Plaintiff

cites do not support its argument. Instead, those paragraphs explain how Plaintiff has already modified its mining plan to keep the mine operational through 2025. Compl. ¶¶ 108–12. The only allegation that mentions potential future harm addresses the possibility that the mine may close or lay off workers if "market conditions materially worsen" before the EIS is complete or the Government does not complete its EIS by the close of 2025, causing Signal Peak to run out of surface to mine. *Id.* ¶ 112. Neither potential harm is likely to come to fruition in the next few months.

Because the court concludes this case is not prudentially ripe, it will deny Plaintiff's motion for a preliminary injunction as moot.

## V.     CONCLUSION

For the foregoing reasons, the court will GRANT in part and DENY in part Defendants' Motion to Dismiss, ECF No. 10; DENY in part the conservation groups' Motion to Intervene, ECF No. 12; and DENY as moot Plaintiff's Motion for a Preliminary Injunction, ECF No. 18. An Order will accompany this Memorandum Opinion.

Date: August 21, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge